IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 21-00026 SOM |
| | ) | |
| Plaintiff, | ) | FINDINGS OF FACT, CONCLUSIONS |
| | ) | OF LAW, AND ORDER GRANTING |
| vs. | ) | DEFENDANT WILLIAM STANEK'S |
| | ) | MOTION TO SUPPRESS |
| WILLIAM STANEK, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER GRANTING DEFENDANT WILLIAM STANEK'S
MOTION TO SUPPRESS**

**I.        INTRODUCTION**

Defendant William Stanek moves to suppress a gun and drugs found by law enforcement through a warrantless search of his bag.  The Government says the search was allowed as incident to Stanek's arrest.  The Government fails to establish that the warrantless search was indeed permitted.

Stanek was arrested, but the search was conducted by police officers clustered around the back of a police patrol car while Stanek sat handcuffed and seatbelted in the back seat of that car, with all car doors closed.  The record does not show that the search served any of the purposes underlying the exemption from the warrant requirement for searches incident to arrest.  Stanek's motion to suppress is granted.

## II.        FINDINGS OF FACT

The facts are not contested.  When the motion was filed, the court raised with the parties the scheduling of an evidentiary hearing, but the parties sent the court a stipulation limiting themselves to exhibits.  ECF No. 69, PageID # 162. Those exhibits, consisting of videos from police body cameras and written materials, are received by the court by agreement of the parties.

In reviewing the briefs, the court realized that the exhibits submitted by the parties left certain gaps in the record.  For example, while there was video showing Stanek removing the bag he was wearing as well as video showing the officers probing and feeling the bag while Stanek sat in the squad car, the court could not tell from any video or document how the bag had been handled from the time Stanek removed it from his body to the time the police performed that tactile search. The court recognized that the gaps could possibly be filled with live testimony, although, of course, it was also possible that no officer had a memory of how the bag had been handled during that interim, meaning that the exhibits provided as complete a picture as was available.

At the start of the hearing on Stanek's motion, the court told the parties that it knew it had discretion to order an evidentiary hearing but was concerned that Stanek had probably

justifiably relied on the parties' stipulation and might be prejudiced by having live evidence sprung upon him by the Government, assuming the Government had such additional evidence. Stanek stated that he had in fact relied on the parties' stipulation and would be prejudiced if the Government were allowed to introduce new evidence.  The Government agreed that Stanek appeared to have made strategic decisions in reliance on the parties' stipulation, and that it would be unfair to Stanek for the court to permit the introduction of further evidence. The court therefore limits itself to the factual record presented in exhibits submitted with the briefs.

In agreeing that the court should rely on the exhibits, the Government articulated one reservation.  The Government stated that it was assuming that the court would not have to make credibility determinations to rule on Stanek's motion.  The Government argued that if a police officer's credibility became an issue, the court should allow the Government to offer new evidence on that issue.  The present ruling is not based on any credibility determination.  Having studied the record, the court finds the following by a preponderance of the evidence.

On December 11, 2019, shortly before 9:40 a.m.,[1]
Officer David Kuaʻana of the Honolulu Police Department noticed
that the safety inspection sticker on the moped Stanek was
operating had expired.  ECF No. 71-2, PageID # 210.  Officer
Kuaʻana stopped Stanek, then learned from HPD's Central Dispatch
that the moped had been reported stolen.  *Id.*  At that point,
Officer Kuaʻana placed Stanek under arrest.  *See* ECF No. 70-1.
In the process, at 9:38 a.m., Officer Kuaʻana instructed Stanek
to take off the black bag he was wearing and to put it on the
ground.  *Id.*  Stanek complied by pulling the strap of the bag
over his head to remove the bag.  *Id.*  The bag, which was smaller
than a backpack and appeared to be of canvas or some other
fabric, was apparently being worn in either a cross-body fashion
or with the strap around his neck like a necklace.  *Id.*  The bag
itself appeared to be positioned in front of or to the side of
his body, not on his back.  *Id.*  Officer Kuaʻana then handcuffed
Stanek behind his back, told him that we was being detained
because he had been driving a stolen moped, and searched him for
weapons.  *Id.*  After the search, Officer Kuaʻana took Stanek to
the back of his patrol car and asked him to sit in the back seat.

---

[1]  The videos taken from HPD officers' body cameras
include time stamps that do not all correspond to a standard
twenty-four-hour clock.  Thus, for example, a time stamp of
"19:38:00" on some body camera footage translates in a police
report to 9:38 a.m., or ten hours before what that time stamp
would represent on a twenty-four-hour clock.  *See* ECF No. 71-2,
PageID # 210.

4

At 9:41 a.m., with Stanek seated, Officer Kuaʻana closed the car door.  *Id.*

By 9:49 a.m., several other officers had arrived at the scene, including Officer Charles Gallimore, an HPD trainee, and Officer Trevino, his training officer.  *See* ECF No. 71-2; *see also* ECF No. 70-2.  Nothing in the record indicates that the bag had been lifted off the ground by then.  At 9:49:54 a.m., the bag was in approximately the same place that Stanek had dropped it, although it may have been moved a few inches to the right. *Compare* ECF No. 70-1 at 2:17 *with* ECF No. 70-2 at 0:05.

At 9:50 a.m., Officer Kuaʻana explained the situation to Officer Gallimore.  ECF No. 70-2.  While they talked, Officer Trevino spoke with two other unidentified officers in the background.  *Id.*  Fragments of the background conversation are audible on the video footage taken from Officer Gallimore's body camera, although the court was unable to discern much of that conversation.  *Id.*  In the video, one of the officers can be heard saying "round in the chamber" and "don't shake it."  *Id.* Another officer says that "it was in his waistband," and, after further discussion, someone says "worth feeling the bag" and "we were gonna do it."  *Id.*

This court cannot draw any conclusions from those brief snippets.  It is not clear that the officers were discussing Stanek's weapon, which, after all, was not in his waistband.

5

Moreover, at the time of that conversation, Stanek's bag was apparently still on the ground, and there was no indication that any of the officers had held the bag.  That portion of the video footage provides an insufficient basis for a finding that the three officers were discussing Stanek's gun or that the officers had any basis for believing at that point that a gun was in Stanek's bag.  Indeed, at the hearing, the Government stated that it could not draw any conclusions from that conversation.[2]

At 9:50:45 a.m., Officer Gallimore took Stanek out of Officer Kuaʻana's car, searched him for weapons again, and transferred him to the back of his own patrol car.  ECF No. 70-2.  Stanek sat down in the back seat, and Officer Gallimore buckled his seat belt.  *Id.*  At 9:52:04, Officer Gallimore closed the door to the back of the car.  *Id.*  At 9:52:24, Officer Gallimore opened the door, told Stanek that he was also being arrested on an outstanding bench warrant, and closed the door again.[3]  *Id.*

---

[2]  Stanek claims that during this conversation "an unidentified officer . . . boast[ed] to fellow officers that he has already felt a gun inside the pack[.]"  ECF No. 71, PageID # 198.  The court, having played and replayed the video, finds that none of the statements intelligible to the court actually includes such a boast.  Stanek appears to have been interpreting the video rather than summarizing it.  The court finds that that portion of video evidence is too unclear to support Stanek's interpretation.

[3]  The record includes references to a warrant for contempt.  ECF No. 71-2, PageID # 210.  This court assumes that a state court had issued the warrant for a failure to appear at a hearing, possibly on a traffic matter.

Stanek remained in handcuffs the entire time.  *Id.*  Officer
Gallimore then sat down in the front passenger seat of his car
and filled out some paperwork.  *Id.*

At 9:53:49 a.m, Officer Gallimore got out and walked to
the back of the car.  *Id.*  Stanek's bag was on the trunk of the
car.  *Id.*  The record does not indicate who moved the bag to the
trunk or how the bag was handled (that is, whether it was carried
by the strap or whether someone had the bag itself in hand during
the move).  *Id.*  As Officer Gallimore got to where the bag was,
two other officers standing behind the trunk were repeatedly
squeezing, poking, and prodding the bag.  *Id.*  At 9:54:00 a.m.,
one of those two officers shouted, "Trevino, come feel this."
*Id.*  Officer Trevino walked over to the trunk, where further
prodding occurred.  *Id.*  Then one of the other officers exclaimed
that "there's a barrel."  *Id.*  An officer felt what he concluded
was the trigger guard.  *Id.*  The three officers appeared to
express some excitement at discovering a gun, with one of them
saying "oh no" multiple times.  *Id.*  The court cannot tell
whether that officer was expressing dismay or surprise.  At
9:54:42, Officer Trevino left the bag with Officer Gallimore, and
told him not to "mess around" with it.  *Id.*  He then asked the
other officers "who recovered the fanny pack" before walking
away.  *Id.*

The HPD officers appear to this court to have been feeling the bag in a deliberate attempt to figure out what was inside it.  Their efforts went beyond a simple touch or an incidental movement of the bag.  The video does not show them finding the barrel of a gun in the course of simply moving the bag or carrying it.  Their extensive probing amounted to a tactile search.

The search occurred on the trunk of Officer Gallimore's patrol car while Stanek was in handcuffs, in the back of that patrol car, strapped in under a seat belt, with all car doors closed.  He could not have reached his bag with a hand or leg, and he certainly could not have opened the bag, destroyed or discarded evidence, or grabbed a gun out of the bag.

The court has before it no evidence that any officer had either an actual suspicion or any reason to suspect that a firearm was in Stanek's bag before the poking and prodding that occurred on the trunk of Officer Gallimore's car.  To the contrary, the body camera video shows that the officers prodded the bag with care and deliberation to discern the gun inside. The bag ended up being placed in the trunk of the car, and Stanek was driven to HPD's Central Receiving at 10:40 a.m.  ECF No. 71-2, PageID # 211.

According to a report written by Officer Gallimore, Officer Trevino, at about 1:00 p.m., told him that the bag was "unusually heavy":

> At about 1300 hours, I was informed by Officer G. Trevino that while handling Stanek's property, he observed that the bag was unusually heavy. Officer Trevino related that due to the weight of Stanek's bag, that it may possibly contain a weapon that is dangerous and advised me to inform Receiving Desk Personnel to handle the item with caution.

ECF No. 71-2, PageID # 211.

At the hearing on the present motion, the Government emphasized Officer Trevino's observation that the bag was "unusually heavy," pointing to that as evidence that he had reason to suspect that the bag held a weapon. But the record does not indicate that Officer Trevino or any other officer noticed this unusual heaviness before the tactile search that was performed on the trunk of the car at 9:50 a.m. There is no evidence that Officer Trevino carried the bag or felt its weight before that tactile search. Nor is there any evidence that Officer Trevino told the officers who conducted the tactile search about the bag's "unusual" weight. Although the court recognizes that whoever moved the bag from the ground to the trunk of the car had an opportunity to feel its weight, the court has no indication that the weight played any role in the tactile search that occurred on the trunk of the car. The court does not

even know who moved the bag to the trunk of the car.  In short, Officer Trevino's observation about the weight and concern about a possible weapon may, on the present record, be just as easily the products of the very tactile search that Stanek is challenging as the reasons for that search.

At around 1:00 p.m., Officer Jacaranda Adler, an officer assigned to HPD's Central Receiving Division, received the bag at the police station.  She described the bag as "heavy in weight and ha[ving] the silhouette of a pisto[l] in it" and said that "[t]he shape of a firearm could be easily felt by applying minimal pressure to the bag."  ECF No. 71-2, PageID # 214.  Officer Adler was not present when the gun was discovered via the tactile search on the trunk of the car.  It is unclear whether she had been expressly alerted to the possibility that a weapon was in the bag.  At about 1:30 p.m., Officer Adler opened the bag to conduct a pre-incarceration search.  *Id.* at 215. Stanek was present for the search.  Officer Adler found that the bag held an unloaded pistol, a magazine with six rounds of ammunition, two small clear plastic bags containing methamphetamine, and other drug paraphernalia.  *Id.*

The court does not have before it the protocol for any search performed at the station, whether to provide an inventory of items received or to prevent unauthorized weapons from entering the station.  At most, the court has a reference to the

10

existence of a policy prohibiting the bringing of weapons into the station, without details that would permit the court to determine whether the protocol implementing any such policy was indeed followed.  ECF No. 71-2, PageID # 211.

The next day, HPD Officer Ryan Nishimura interviewed Stanek.  Stanek told Officer Nishimura that he had gotten the stolen moped from "Ram," and that "Kathy" had given him the gun and the drugs.

Stanek was indicted on March 4, 2021, for having knowingly and intentionally possessed with intent to distribute five grams or more of methamphetamine, its salts, isomers, or salts of its isomers, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A), and for having knowingly possessed a firearm, namely, a .22 caliber Llama pistol, in furtherance of one or more drug trafficking crimes for which he could be prosecuted in a court of the United States.  ECF No. 57, PageID # 131.

## III.      CONCLUSIONS OF LAW

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  *See United States v. Place*, 462 U.S. 696, 701 (1983).  The Fourth Amendment "incorporates a strong preference for search warrants."  *United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992).  Unless a

11

warrantless search or seizure falls within at least one of a few exceptions, it is *per se* unreasonable.  *See Morgan v. United States*, 323 F.3d 776, 781 (9th Cir. 2003).  The Government bears the burden of demonstrating that an exception to the warrant requirement applies.  *Carbajal*, 956 F.2d at 930 ("The burden is on the Government, moreover, to show the reasonableness of a warrantless search.  This includes demonstrating that the search comes within one of the narrow exceptions to the warrant requirement."); *see also United States v. Jeffers*, 342 U.S. 48, 51 (1951) ("the burden is on those seeking the exemption [from the warrant requirement] to show the need for it").

### A.  Only the Search on the Trunk of the Car Matters.

The only question before the court on the present motion is whether the tactile examination of Stanek's bag while it was on the trunk of Officer Gallimore's car violated the Fourth Amendment.  Although an HPD officer conducted a second search at Central Receiving, "if [the first] search was valid, then the second warrantless search was permitted so long as [the bag] remained in the legitimate uninterrupted possession of the police."  *United States v. Cook*, 808 F.3d 1195, 1199 (9th Cir. 2015) (internal quotation marks and punctuation omitted).  There is no dispute that the bag remained in the officers' uninterrupted possession between the two searches.  Thus, if the

search on the trunk of the car was valid, the search at the
police station is too.

Conversely, if the search on the trunk of the car was
invalid, the Government cannot rely on the subsequent search at
the police station.  The Government never argues that that was a
search incident to arrest.  *See United States v. Chadwick*, 433
U.S. 1, 15-16 (1977) (holding that items that are not immediately
associated with the person of the arrestee cannot be searched
incident to arrest if the search was remote in time or place from
the arrest), *abrogated on other grounds by California v. Acevedo*,
500 U.S. 565 (1991).

Nor can this court view the search at the station as an
allowable inventory search that would have inevitably revealed
what was in Stanek's bag.  It appears that, at different times,
the Government has made two different arguments under the
inevitable discovery doctrine.  In a footnote in its opposition,
the Government asserted that "the contents of Stanek's bag would
have been inevitably discovered" during an inventory search at
HPD's Central Receiving Doctrine.  ECF No. 70, PageID # 180.
That appeared to be a reference to a standard argument based on
the kind of hypothetical inventory search that would have
occurred regardless of whether the officers had or had not
already discovered Stanek's weapon.  At the hearing, however, the
Government appeared to shift slightly to be arguing that the

13

search at the police station was the kind of search that would have been conducted of any item brought into the station, whether or not it was to be inventoried.

Irrespective of how the Government's argument is construed, the inevitable discovery doctrine does not apply here. That doctrine allows courts to admit unlawfully discovered evidence "if the government establishes by a preponderance of the evidence that the . . . information ultimately or inevitably would have been discovered by lawful means." *United States v. Peterson*, 902 F.3d 1016, 1019 (9th Cir. 2018) (internal quotation marks and punctuation omitted).

It is common for prosecutors to assert that evidence would have been inevitably discovered in an administrative search. Once an arrestee is brought to the station, police may "search any container or article in his possession, in accordance with established inventory procedures." *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983). Inventory searches protect police from false claims of theft and also ensure that dangerous articles are not brought into the station. *Id.* at 646. But an "inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Inventory practices therefore must be regulated by "standardized criteria" or "established routine[s]" that are "designed to produce an inventory." *Id.*

14

To meet its burden of showing that contraband would
have been inevitably discovered in an inventory search, the
Government must prove that (1) "the police agency in question
conducted inventory searches pursuant to 'established'
or 'standardized' procedures," and (2) "those inventory
procedures would have inevitably led to the discovery of the
challenged evidence[.]"  *United States v. Mendez*, 315 F.3d 132,
138 (2d Cir. 2002) (internal quotation marks omitted); *accord*
*United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir.
1989) ("The government can meet its burden by establishing that,
by following routine procedures, the police would inevitably have
uncovered the evidence."); *see also United States v. Avendano*,
373 F. App'x 683, 685 (9th Cir. 2010) ("The government concedes
that it failed to meet its burden of proving a standardized local
procedure and compliance with that procedure.  Because of the
government's failure of proof, we cannot affirm the district
court on the alternative ground of inevitable discovery.").

The Government has not satisfied either requirement.
It has presented no evidence that HPD routinely conducts
inventory searches or that such searches are governed by
standardized procedures that would have inevitably led to the
discovery of what was in Stanek's bag.

As the Government pointed out at the hearing on the
present motion, Officer Gallimore's report does mention a

15

"departmental and division policy governing the introduction of contraband and/or dangerous items into a detention facility." ECF No. 71-2, PageID # 211.  Pursuant to that policy, at some time after 1 p.m., it was "necessary to conduct a search of Stanek's bag for the specific purposes of retrieving a possible firearm, clearing it, rendering it safe, and submitting the firearm as evidence in a subsequent investigation[.]"  *Id.*  That statement is insufficient to establish that the evidence recovered from Stanek's bag would have been inevitably discovered or is otherwise admissible.

As an initial matter, the policy mentioned by Officer Gallimore does not appear to be an inventory policy.  Even if HPD has a policy of not permitting contraband into its detention facilities, that does not mean that HPD routinely searches all seized items for the purpose of taking an inventory.  The policy Officer Gallimore describes appears to involve excluding items from the police station, while an inventory policy is aimed at documenting what is received at the police station.  The exclusion policy may apply to visitors, not just to detainees, and a visitor could conceivably comply with the exclusion policy by simply taking a prohibited item like a pocket knife back to the visitor's car and leaving it there while the visitor was at the station.  Clearly, that would not match up with any interest in keeping an inventory.

16

Even if the court considers the policy described by Officer Gallimore, the court lacks evidence that it was implemented through specific, standardized procedures.  At most, Officer Gallimore's statement shows that there is a policy of removing dangerous materials from personal property.  But Officer Gallimore's report does not outline what routine procedures, if any, the officers were required to follow to determine which items contain contraband or dangerous materials.  Without such evidence, the Government cannot show that "by following routine procedures, the police would inevitably have uncovered the evidence" that it actually discovered through the warrantless tactile search on the trunk of the car.  *See Ramirez-Sandoval*, 872 F.2d at 1399.

Besides removing the need for an officer to puzzle over how to react whenever a detainee arrives with property, an established policy eliminates unfettered discretion on the part of officers.  When the contours of administrative searches are laid out clearly, officers know not just when and what to search, but also how to search.  An officer cannot simply choose to search a particular person's container or a particular type of container.  The absence of administrative detail in the record of this case prevents this court from concluding that the evidence Stanek seeks to have this court suppress would inevitably have

17

been discovered or that it was even found through a search
conducted pursuant to articulated HPD administrative procedures.

At the hearing on the present motion, counsel for the
Government mentioned that there was an HPD policy requiring items
to be X-rayed, but that the X-ray machine was out of order on the
day Stanek was arrested.  Stanek objected, and this court
acknowledged that those purported circumstances were not properly
before the court in an admissible form.  In any event, the court
has before it no evidence indicating what, if any, procedures
were in place either with or without an equipment failure.  If
machinery was broken, the Government would have had to present
evidence of the procedures applicable to "broken equipment"
circumstances, not to the routine use of the X-ray machine.  This
court cannot tell that "broken equipment" procedures even
existed.  In short, the reference to the broken X-ray machine
increases the court's resistance to any argument about the
inevitable discovery doctrine.

It is the Government's burden to establish by a
preponderance of the evidence that the evidence at issue would
have inevitably been administratively discovered.  *See Carbajal*,
956 F.2d at 930; *see also Jeffers*, 342 U.S. at 51.  The
Government does not meet its burden on this point.

###### B.   The Tactile Examination of Stanek's Bag Constituted a Search Under the Fourth Amendment.

The search on the trunk of the car did not involve opening the bag to view its contents.  It nevertheless constituted a search under the Fourth Amendment.

In *Bond v. United States*, the Supreme Court considered law enforcement officers' "probing tactile examination" of a defendant's bag and held that the officers had conducted a search.  529 U.S. 334, 337-39 (2000).  The defendant had placed the bag in an overhead bin on a bus, not expecting that any other passenger would "feel the bag in an exploratory manner." *Id.* at 338-39.  In feeling the bag, the officers in that case violated the defendant's reasonable expectation of privacy even though they did not actually open the bag.  Similarly, as the Government conceded at the hearing, Stanek had no reason to expect anyone to poke and prod his bag in an exploratory manner.[4]  What the officers did with the bag on the trunk of the car is governed by *Bond* and constituted a search, a conclusion that, at the hearing

---

[4]   In her report, Officer Adler asserted that "the shape of a firearm could be easily felt by applying minimal pressure to the outside of the bag."  ECF No. 70-6, PageID # 189. However, the Government does not argue that the search on the trunk of the car was conducted by "applying minimal pressure" or that the firearm was in "plain view" or fell under the corollary "plain feel" doctrine addressed in *Minnesota v. Dickerson,* 508 U.S. 366 (1993).  Officer Adler's search does not overcome the warrant requirement, as explained in this court's earlier discussion about the lack of evidence of what procedures governed Officer Adler.

on the present motion, the Government confirmed it is not
contesting.

### C.   The Government Has Not Met Its Burden of Showing that the Search Incident to Arrest Exception to the Warrant Requirement Applies.

The question at the heart of the present motion is
whether the tactile search fits into any exception to the warrant
requirement.  If it does not, the warrantless search was *per se*
unreasonable and therefore violated the Fourth Amendment,
requiring suppression of the resulting evidence.  The Government
relies on one such exception, which permits a search conducted
incident to a lawful arrest.  *See generally Riley v. California*,
573 U.S. 373, 382 (2014).  "[A] police officer who makes a lawful
arrest may conduct a warrantless search of [1] the arrestee's
person and [2] the area within his immediate control."  *Davis v.
United States*, 564 U.S. 229, 232 (2011) (quotation marks
omitted).

As a general matter, searches incident to arrest are
conducted for the "purposes of protecting arresting officers and
safeguarding any evidence of the offense of arrest that an
arrestee might conceal or destroy."  *Arizona v. Gant*, 556 U.S.
332, 339 (2009) (citing *Chimel v. California*, 395 U.S. 752, 763
(1969)).  However, different rules apply to searches "of the
arrestee's person" and searches of "the area within his immediate

control."[5]  *United States v. Gordon*, 895 F. Supp. 2d 1011, 1018
(D. Haw. 2012), *aff'd*, 694 F. App'x 556 (9th Cir. 2017).  It
therefore matters a great deal which prong of the "incident to
arrest" analysis a case falls under.

### 1.    The Court Is Not Analyzing the Search of Stanek's Bag As a Search of His Person.

This court questioned the Government about whether it
was arguing that this case fell under the first prong (involving
a search of Stanek's person).  What gave rise to the court's
request for clarity on the issue was Stanek's wearing of his bag.
Under the first prong, items that may be searched without a
warrant include items that "can be characterized as an element of
the [arrestee's] clothing."  *United States v. Monclavo-Cruz*, 662
F.2d 1285, 1290 (9th Cir. 1981).  Clothing worn by an individual
at the time of arrest and items found in such clothing (such as
in a pocket) are "immediately associated with the person of the
arrestee" and may be searched even well after an arrest occurs,
irrespective of whether exigent circumstances justify the search.
*See id.; see also Riley*, 573 U.S. at 384 (internal quotation
marks omitted); *Chadwick*, 433 U.S. at 15-16*; United States v.*

---

[5]  The two situations are treated differently because
searches of an arrestee's person are also justified by "reduced
expectations of privacy caused by the arrest," but that rationale
does not extend to "searches of possessions within an arrestee's
immediate control."  *Chadwick*, 433 U.S. at 16 n.10.

21

*Edwards*, 415 U.S. 800, 803-04 (1974); *United States v. Robinson*, 414 U.S. 218, 236 (1973).

Thus, if Stanek's bag were deemed to be clothing worn by him at the time he was arrested, the search on the trunk of the car while he was sitting handcuffed in the car would be allowed as incident to arrest.  If, however, the bag does not qualify as clothing and instead must be viewed under the second prong (involving items within the arrestee's immediate control), the officers' right to search the bag is more constrained.  *See Riley*, 573 U.S. at 384; *see also Chadwick*, 433 U.S. at 15-16.

Much of the law concerning searches of bags has developed in contexts in which bags were carried or were placed on or near an arrestee.  Ninth Circuit decisions indicate that, in such circumstances, bags or similar items are not usually items of clothing.  *See, e.g., United States v. Nohara*, 3 F.3d 1239, 1243 (9th Cir. 1993) (treating a bag in the arrestee's hand as an item police did not have an absolute right to search under *Robinson* and *Edwards*); *Monclavo-Cruz*, 662 F.2d at 1290 (treating a purse on the arrestee's lap as an item police did not have an absolute right to search under *Robinson* and *Edwards*).

Case authorities have tended not to focus on whether a bag that is worn by an arrestee should be treated the same way as a handheld bag.  One could imagine a line of cases developing over whether things like fanny packs buckled around arrestees'

22

waists or small bags hanging from straps worn like necklaces
should qualify as clothing.  There is not, however, a distinct
line of such cases.  In *United States v. Knapp*, the Tenth Circuit
discussed at length why a purse that was "carried" or "handheld"
was not "of the person" and therefore did not fall under the
first prong's search rules.  917 F.3d 1161, 1166-68 (10th Cir.
2019).  The Tenth Circuit held that the purse was not an item of
clothing because it was "easily capable of separation from [the
arrestee's] person" and it was not concealed under the arrestee's
clothing.  *Id.*  However, the court did not address whether the
purse would have been an item of clothing had it been worn,
rather than carried.  *Id.*  At least one court, addressing an
admissibility issue in the context of a *Terry* stop rather than a
search incident to arrest, has deemed a fanny pack worn around
the waist to be an item of clothing.  In *United States v.
Kithcart*, the Third Circuit noted that the fact that a gun was
found in a defendant's "fanny pack indicates that it was found in
a search of his outer clothing, which is expressly permitted by
*Terry.*"  34 F. App'x 872, 873 (3d Cir. 2002).

        In response to a minute order seeking an express
statement from the Government as to whether it was arguing that
Stanek's bag fell under the first prong, *see* ECF No. 72, the
Government responded that its position was that Stanek's bag was
not an element of his clothing.  ECF No. 73, PageID # 220.  The

court told the parties at the hearing on this motion that it
would hold the Government to that position.  This court is
therefore not treating Stanek's bag as immediately associated
with his person and is instead analyzing the search under the
second prong, which governs warrantless searches of items seized
from the area within an arrestee's immediate control.

> **2.  The Search of Stanek's Bag was Unreasonable
> Because Exigent Circumstances did not Justify
> the Search.**

Under the second prong of the "incident to arrest"
analysis, the search of Stanek's bag was reasonable only if (1)
the property searched was "under [Stanek's] immediate control
when he was arrested," and (2) "events between the time of the
arrest and the search [did] not render the search unreasonable."
*Nohara*, 3 F.3d at 1243.

There is no dispute that the bag was under Stanek's
immediate control when he was first arrested.  Thus, the only
issue is whether the events that occurred after Stanek's arrest
rendered the search unreasonable.

"[M]ere temporal or spatial proximity of the search to
the arrest" does not make a search reasonable.  *Maddox*, 614 F.3d
at 1049.  Instead, "some threat or exigency must be present to
justify the delay."  *Id.; see also Chadwick*, 433 U.S. at 15
("[W]arrantless searches of luggage or other property seized at
the time of an arrest cannot be justified as incident to that

arrest *either* if the search is remote in time or place from the arrest, *or* no exigency exists.  Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." (emphasis added) (internal quotation marks and citations omitted)).[6]  The Government has not established that any exigency justified the warrantless search here.

Two different exigent circumstances frequently permit warrantless searches of containers seized from the area within an arrestee's immediate control.  First, officers may search an item if there is a reasonable possibility that the arrestee could reach it and destroy evidence or obtain a weapon.  *See generally Cook*, 808 F.3d at 1200.  Second, a container may be searched if officers have a legitimate belief that a dangerous

---

[6]  The court notes that the Supreme Court appeared to limit the reach of *Chadwick* in *New York v. Belton.*  453 U.S. 454, 461-62 (1981).  In *Gant*, however, the Supreme Court abrogated *Belton* and reiterated that searches incident to arrest can only be conducted for the twin "purposes of protecting arresting officers" or "safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy."  556 U.S. at 339; *see also Cook*, 808 F.3d at 1199 n.1 ("We do not read *Gant*'s holding as limited only to automobile searches because the Court tethered its rationale to the concerns articulated in *Chimel,* which involved a search of an arrestee's home."); *cf. Davis*, 564 U.S. at 234 (explaining how *Gant* affected the holding of *Belton*).

instrumentality, such as a weapon, is inside.[7]  *Maddox*, 614 F.3d at 1048-49.  The Government has not met its burden of showing the presence of either circumstance here.

> ### a.   Stanek was Not Within Reaching Distance of his Bag when the Search Occurred.

Stanek could not have reached the bag when HPD officers searched it on the trunk of the car.  In so concluding, this court does not rely only on the fact that Stanek was handcuffed.  The Ninth Circuit has frequently permitted searches that occurred even after law enforcement officers placed arrestees in handcuffs.  *See, e.g.*, *Cook*, 808 F.3d at 1200.  In those cases, the arrestees remained within reaching (or at least kicking) distance of the items at issue, so there was a danger that an arrestee might "break free and reach for [the item]."  *Id.*; *see also Gordon*, 694 F. App'x at 557; *Nohara*, 3 F.3d at 1241, 1243 (permitting a search that occurred when the arrestee was seated a few feet away from the officer); *United States v. Tarazon*, 989 F.2d 1045, 1051 (9th Cir. 1993) (permitting a search that occurred when the arrestees "were placed on the floor near" the desk that was searched).

---

[7]  Of course, this list is not exhaustive.  *See Cook*, 808 F.3d at 1200 (suggesting that exigent circumstances might be present if officers have a "reasonable fear that a bystander or additional unidentified co-conspirator might intervene").  But the Government has not argued that any other exigency justified the search here.

But, in most cases involving an arrestee who is both handcuffed and separated from his property by being placed in the back of a patrol car with its doors shut, any exigency evaporates.  At that point, the arrestee can no longer reach the item, and the risk is small that the arrestee will break free and destroy evidence or retrieve weapons.  *Maddox*, 614 F.3d at 1048-49 ("Maddox's person was handcuffed in the back of the squad car, incapable of either destroying evidence or presenting any threat to the arresting officer."); *see also Gant*, 556 U.S. at 343 (explaining that when three arrestees had "been handcuffed and secured in separate patrol cars," they "clearly [were] not within reaching distance of [their] car"); *Cook*, 808 F.3d at 1200 (indicating that the search would not have been permitted if the arrestee was "locked inside a patrol car"); *cf. Gordon*, 694 F. App'x at 557 (permitting a search because the arrestee was still "within reaching distance" of a bag).

Those decisions control the outcome here.  Stanek was handcuffed, in the back of a patrol car with all its doors shut, and strapped in by a seatbelt while the HPD officers searched his bag by conducting a probing tactile examination.  There was no threat that Stanek could have broken free and accessed his bag, and the Government has never asserted that Stanek could have destroyed evidence stored in the bag or pulled a weapon out of it.  *See Maddox*, 614 F.3d at 1048-49; *Gant*, 556 F.3d at 343;

27

*United States v. Guzman-Guerrero*, 2016 WL 10951813, at *4 (E.D. Wash. Mar. 2, 2016) ("As the instant scenario does not contain similar aggravating circumstances as in *Cook*, the Court finds that it was not reasonable for Agent McElheran to perform even a cursory search of Defendant's backpack.").

> **b.   There is No Evidence that the Officers had a Reason to Suspect a Gun was in Stanek's Bag Before the Tactile Search.**

The record is similarly devoid of evidence that the HPD officers who conducted the search on the trunk of the car had any reason at all to think there was a weapon in Stanek's bag. Searches of personal property may be justified by a "legitimate concern for the officers' safety." *Maddox*, 614 F.d at 1048 (citing *United States v. Turner*, 926 F.2d 883, 888 (9th Cir. 1991) and *United States v. Hudson*, 100 F.3d 1409, 1420 (9th Cir. 1996)). If officers have a reasonable basis for believing that a container holds a dangerous item, they may secure it. *See id.* at 1048-49; *see also Chadwick*, 433 U.S. at 15 n.9 ("[I]f officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon."). As the party arguing that this exception to the warrant requirement applies, the Government bears the burden of showing that the HPD officers who conducted the first search had a reasonable basis for believing

28

that a pistol was inside.  *See Carbajal*, 956 F.2d at 930; *see also Jeffers*, 342 U.S. at 51.  That burden has not been met.

At the hearing, the Government argued that the officers could have concluded that the bag held a weapon because of its weight.  The only statements in the record discussing the bag's weight, however, were made after the search itself.  In Officer Adler's report, she indicated that when she held the bag at approximately 1 p.m. after Stanek was brought to the station and booked, she noticed that the bag was "heavy in weight."  ECF No. 70-6, PageIDD # 189.  Officer Gallimore's report similarly states that, at about 1 p.m. (after Stanek had already been brought to the station and booked), Officer Trevino observed that "the bag was unusually heavy."  ECF No. 71-2, PageID # 211.  Neither statement shows that, *at the time of the search* some hours

earlier,[8] any officer had thought the bag's weight was remarkable.  Nor does any other evidence.

Moreover, a bag's weight alone can rarely give law enforcement officers a legitimate basis for concluding that the bag holds a weapon.  A purse will often be heavier than the weight of a handgun, but officers cannot search every purse they seize without a warrant.  *See, e.g.*, *Monclavo-Cruz*, 662 F.2d at 1290; *see also Knapp*, 917 F.3d at 1166.  Similarly, suitcases and other luggage will almost always be heavy enough to contain weapons, and law enforcement officers certainly do not possess an unqualified right to search those items.  *See generally Chadwick*, 433 U.S. at 15-16.

At the hearing, the Government indicated that it was not arguing that police officers could search every bag heavy enough to carry a pistol in connection with a lawful arrest.

---

[8]  The ultimate question under the Fourth Amendment is whether the search was objectively reasonable.  The answer to that question is naturally affected by what the officers knew. In evaluating the existence of probable cause, for instance, courts determine whether a search was objectively reasonable based on the facts known to an officer at the time of an arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (*except for the facts that he knows*) is irrelevant to the existence of probable cause." (emphasis added)).  Similarly, this court must ascertain what the officers who first searched Stanek's bag knew.  The search would only have been reasonable if those officers could have concluded, *based on the facts known to them*, that there was a reasonable possibility that a weapon was inside.

Instead, the Government maintained that the search in this case was reasonable because Officer Trevino observed that the bag was "unusually" heavy, presumably given its size. ECF No. 71-2, PageID # 211. But, as this court has already emphasized, there is no evidence that any HPD officer considered the bag's weight remarkable in any way before the first search began on the trunk of the car, or while it was occurring. Officer Trevino's comment came hours after that search, and it is not clear when Officer Trevino first touched the bag.

Moreover, it is not clear why even an "unusual" weight would have aroused any concern about a weapon. All Officer Trevino's statement demonstrates is that not all bags like Stanek's are as heavy as Stanek's bag was. That does not suggest that the bag contained a gun. There are innumerable reasons that a small bag could be heavy enough to contain a small handgun. A book could make a bag unusually heavy, as could a large bottle of water or some other beverage. A camera with lens attachments could add weight; small electronic devices or accessories could do the same. Someone might carry fruits or other food of similar weight. If all that was required was a showing of enough weight to preclude "ruling out" a weapon, then nearly every bag could be searched without a warrant. Few people bother to wear a bag that holds only something as light as, say, a single sheet of paper.

31

Apart from those two statements about the bag's weight, nothing else in the record even hints at what Stanek's bag might have contained.[9]  Stanek was arrested for driving a stolen vehicle and having an outstanding bench warrant, apparently for having failed to appear in state court.  These circumstances do not suggest that he may have been dangerous, much less armed.  There is no evidence that Stanek was arrested at a time or place known for gun violence or even drug trafficking, for example.  Stanek was not behaving aggressively.  Instead, he was entirely cooperative.  The Government has failed to point to sufficient evidence to justify the search.  *Cf. Cook*, 808 F.3d at 1200 (noting that law enforcement officers "had already recovered two firearms from the house associated with Cook's co-conspirator").

At the start of this order, this court noted that the law clearly places the burden on the Government to establish that the search falls within an exception to the warrant requirement.  Based on the facts that the parties agreed constituted the record relevant to this motion, this court concludes that the Government has not met that burden.  The court recognizes that the parties must live with the factual record they have, and there may simply not be more facts supporting the search.  The facts that are

---

[9]  Officer Adler's statement that the bag "had the silhouette of a pisto[l] in it," ECF No. 70-6, PageID # 189, was also made at 1 p.m. and says nothing about what the officers who searched the bag on the trunk of the car noticed.

before this court do not indicate that, at the time the bag was
searched on the trunk of the car, Stanek could have reached his
bag, or that, before their tactile search, any officer had reason
for concern that the bag contained a weapon. That leaves the
Government with no exigent circumstance justifying the search of
the bag while Stanek sat handcuffed and seatbelted in a squad
car.  The tactile search of Stanek's bag was not legitimately
incident to his arrest.  *See Maddox*, 614 F.3d at 1048-49.

### D.   The Statements Stanek Made the Next Day Are Suppressed as Fruits of the Poisonous Tree.

Stanek argues that if the search of his bag violated
the Fourth Amendment, the statements he made to the police the
next day should also be suppressed as fruits of the poisonous
tree. *See generally United States v. Gorman*, 859 F.3d 706, 716
(9th Cir. 2017) ("Evidence derivative of a Fourth Amendment
violation—the so-called 'fruit of the poisonous tree,'—is
ordinarily tainted by the prior illegality and thus inadmissible,
subject to a few recognized exceptions." (internal citations and
quotation marks omitted)).  At the hearing on Stanek's motion,
the Government said that, for the purposes of this case, it would
not argue that the statements Stanek made the next day might be
admissible even if the search of the bag was unlawful.  In short,
the Government conceded that the admissibility of the statements
rose or fell with the admissibility of the evidence seized from

33

Stanek's bag.  The court suppresses those statements along with
the evidence obtained from Stanek's bag.

**IV.      CONCLUSION.**

Stanek's motion to suppress is granted.

The court emphasizes that this decision turns on the
lack of evidence of any exigency.  The court is not here ruling
that the law requires officers to put themselves at risk by
refraining from searching bags they confiscate.  The court is
instead ruling that, when the Government seeks to justify a
warrantless search under the "within the arrestee's control"
prong of the law applicable to a search incident to arrest, the
Government must make some showing of some risk.  In the absence
of such a showing, the evidence recovered through such a search
must be suppressed.

It is so ordered.

DATED: Honolulu, Hawaii, April 29, 2021.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*United States v. Stanek*, Cr. No. 21-00026 SOM; FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND ORDER GRANTING DEFENDANT WILLIAM STANEK'S MOTION TO SUPPRESS